UNITED STATES of America, Plaintiff,

v.

Seth Thomas LUKENS, Defendant.

No. CR89–096–K.

United States District Court,
D. Wyoming.

April 13, 1990.

---

David A. Kubicheck, Asst. U.S. Atty. D. Wyo., Casper, Wyo., for plaintiff.

Ronald Pretty, Cheyenne, Wyo., for defendant.

ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS PHYSICAL EVIDENCE, STATEMENTS, AND/OR CONFESSIONS (WITH FINDINGS)

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court on defendant's motions to suppress; plaintiff appearing by and through its attorney, David A. Kubicheck, Assistant United States Attorney for the District of Wyoming; defendant appearing by and through his attorney, Ronald G. Pretty; and the Court having heard the arguments of counsel and having fully and carefully reviewed and considered the motions and all matters pertinent thereto, and being fully advised in the premises, FINDS:

At approximately 10:14 p.m. on August 17, 1989, officer Andrew Tkach of the Buffalo Police Department went to a local Taco John's establishment in response to an employee's phone call about a suspicious person who had been in the parking lot for some time. When he arrived, Tkach found defendant Lukens standing beside a beige 1981 Chevrolet Impala with Montana license plates and told him of the suspicious person report. Upon request, Lukens produced a South Dakota driver's license. He explained that the vehicle belonged to a friend in Montana who had loaned it to him and that he was waiting in the parking lot for his girlfriend who was en route from Gillette, Wyoming. Tkach ran a registra-

tion check and verified that the automobile belonged to the individual Lukens had identified. Then Tkach ran a routine check on the driver's license. While he was waiting for a response, Tkach, believing Lukens' story, returned the driver's license and proceeded to drive around the parking lot.

Within moments after driving off, Tkach learned that Lukens was wanted in Crook County, Wyoming on a failure to appear charge for driving while under suspension. Tkach returned to Lukens and handcuffed him at about 10:20 p.m. As the two were walking to the patrol vehicle, Tkach asked Lukens whether he was carrying any large amounts of money or illegal drugs. Lukens responded in the negative. Tkach then asked if he could look inside the vehicle. Lukens responded, "Do you need to?" The officer said he "would like to." Lukens then said "okay." Tkach walked back to the Impala after placing Lukens in the squad car. Inside, under the driver's seat, Tkach retrieved a purple "Crown Royal" cloth bag containing two plastic "zip-lock" bags of a white powder, later determined to be methamphetamine. By this time, a deputy sheriff had arrived on the scene. Tkach read Lukens his Miranda rights and asked the deputy to transport Lukens to the police station in Buffalo.

By 10:40 p.m., Tkach had returned to the police station. At that time, Lukens denied knowledge of the drugs. Tkach talked with Lukens some twenty minutes later in the deputy's presence. Again Lukens denied knowledge of the drugs. Tkach indicated he would probably find Lukens' fingerprints on the bags. Lukens responded, "You probably will." Tkach asked if it was cocaine. Lukens said "no." Tkach then asked if it was methamphetamine. This time Lukens nodded his head up and down. After that, Lukens related that he was in a lot of trouble and that "maybe he should talk to a lawyer." Tkach asked no more questions and placed Lukens in a holding cell.

At about 11:40 p.m., Tkach notified the state's Division of Criminal Investigation (DCI) of the drug arrest. Some two to three hours later, DCI special agent Kevin Hughes and another agent arrived from Gillette. Tkach briefed Hughes on what had transpired, including Lukens' statement that "maybe he should talk to a lawyer." Hughes had Lukens brought to an interview room and asked him if he had been advised of his rights and, if so, whether he understood them. Appearing alert, Lukens responded affirmatively. Hughes then advised Lukens that if prosecuted under federal law, he would be looking at a mandatory five-year minimum sentence due to the quantity of methamphetamine seized. Hughes reminded Lukens of his earlier statement regarding an attorney and reiterated that he had a right to an attorney if he wanted one. Acknowledging the trouble he was in, Lukens responded, "I'll talk to you now." Lukens proceeded with four different stories concerning the acquisition and planned disposition of the methamphetamine. After giving these stories, Lukens said he wanted a lawyer. No further questions were asked.

Later that morning the DCI agents transported Lukens to Casper for an appearance before the Federal Magistrate. Enroute, Lukens started spontaneously saying, "You all ought to just shoot me. When you're broke, you do stupid things." Lukens then volunteered that his only involvement with the methamphetamine was for the money and that he was not a user. Hughes then recited some names of suspected methamphetamine dealers in Billings, Montana and inquired whether Lukens knew any of them. Lukens said "no."

Defendant seeks to have the physical evidence suppressed, contending that the search was unreasonable, nonconsensual, and without probable cause. Additionally, defendant seeks suppression of any and all statements or confessions made as tainted and for the reasons that the same were obtained after Lukens' request for an attorney and upon law enforcement officers' representations of a lesser sentence if he cooperated. Defendant also maintains that the statements should be suppressed due to the failure of the Government to promptly bring him before a magistrate.

■ At the outset, officer Tkach's initial encounter with Lukens, rather than being a seizure or detention of his person, was precisely the sort of consensual police/citizen encounter envisioned in *Florida v. Royer*, 460 U.S. 491, 497–498, 103 S.Ct. 1319, 1323–1324, 75 L.Ed.2d 229 (1983), as being outside the Fourth Amendment. Constitutional scrutiny occurs at the point where a person becomes sufficiently detained such that it becomes obvious that he is no longer free to terminate the encounter. To justify a brief investigative stop, an officer need have only a reasonable suspicion, supported by articulable facts, that the detained individual was involved in some wrongdoing. *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). *See also Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968). Reasonable suspicion entails more than an inchoate "hunch" but less than the level of suspicion required for probable cause. *Sokolow*, 109 S.Ct. at 1585. No one particular fact is necessarily sufficient; rather, the detention must be judged against the totality of the circumstances. *Id.*

Contrary, then, to defendant's suggestion, the officer did not need probable cause to take the defendant's driver's license and run a check on it. All he needed was reasonable suspicion of wrongdoing. Viewed in this light, what the officer had was a late-night call from a concerned service employee regarding an individual parked in the establishment's parking lot who had been there for at least an hour. With the establishment's closing time at hand, that concern was both understandable and justifiable. There existed a reasonable suspicion on the part of the officer that criminal activity was being contemplated, if not already in progress. That in the end he appeared to be involved in no criminal activity but rather was simply waiting for his girlfriend does not diminish the reasonableness of the officer's suspicion at the time he asked for Lukens' driver's license. *Cf. Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam) (acknowledging the existence of circumstances wherein wholly lawful conduct might justify the suspicion that criminal activity was afoot). The encounter, less than five minutes, was minimally intrusive.

There is nothing improper with Lukens' arrest either. As the officer testified, the arrest came about not due to Lukens' loitering in a public parking lot but because of an outstanding warrant from another county related to a driving offense.

■ On the search conducted by Tkach, the Court finds that the defendant voluntarily consented. When Lukens took the stand at the suppression hearing, he provided no testimony on the consent issue, focusing instead on his request for an attorney. Since defendant's counsel presented no testimony to contradict Tkach's version of events, consent was voluntary. This vitiated the need for probable cause and justified the search and seizure of the methamphetamine.

Lukens also claims that subsequent statements made to Tkach and the deputy and later to Hughes were taken during periods of unnecessary delay between his arrest and his appearance before a magistrate. He also claims that some of the statements were obtained in violation of his right to have counsel present. Lukens' own testimony disclosed no coercion on the part of any law enforcement officers.

Statements or confessions are admissible into evidence if voluntarily given. Voluntariness is determined from the totality of the circumstances, including

(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such

defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b). The presence or absence of any of these factors is not conclusive on the voluntariness issue. *Id.*

■ Similarly, the issue of delay in bringing the defendant before a federal magistrate is but one factor going to voluntariness. However, a confession will be suppressed if the delay is unnecessary. *United States v. Killian,* 639 F.2d 206, 211 (5th Cir. Unit A 1981), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981). *See also* Fed.R.Crim.P. 5(a). If the Court deems the confession voluntary and if it was given within six hours following the arrest, a delay in bringing the defendant before a magistrate will not be fatal so long as the weight to be given any such statements is left for the jury. 18 U.S.C. § 3501(c). Statements made beyond the six-hour period are also envisioned as admissible if the delay is found to be reasonable given the means of transportation and the distance to the nearest available magistrate. *Id.*

■ Lukens was arrested at approximately 10:20 p.m. according to Tkach. At about 10:40 p.m., he arrived at the police department. Within the hour, Lukens made his first statement regarding the probability of finding his fingerprints on the bags and admitting the powder was methamphetamine. By 11:40 p.m., the time when Tkach notified the DCI, Lukens had been placed in a holding cell due to his later statement indicating that "maybe he should talk to a lawyer." According to Hughes' testimony, the DCI agents arrived from Gillette at about 1:30 a.m. For about an hour, the agents were briefed and otherwise familiarized with what had transpired. At approximately 2:30 a.m., Hughes asked that Lukens be brought from the detention cell to ascertain whether Lukens wanted an attorney. After Hughes asked Lukens whether he wanted an attorney, Lukens admitted he was in trouble and told the agent he would talk. This interview lasted until 3:00 a.m., at which time Lukens stated he wanted an attorney and questioning ceased. Enroute to Casper, Hughes testified, Lukens initiated the conversation referred to earlier, admitting his involvement with methamphetamine was motivated solely by a need for money. This, Lukens did not deny at the hearing. Lukens appeared before a magistrate on August 22, 1989.

Under the circumstances, this delay was not unnecessary. The delay subsequent to his statements is not at issue; only the period of time between his arrest and his statements to Tkach and Hughes—some five hours—is involved. Clearly this comes within the six-hour period of § 3501(c). Additionally, delay under § 3501(c) is measured from the beginning of federal detention. *See, e.g., United States v. Watson,* 591 F.2d 1058, 1061–1062 (5th Cir.1979), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1070 (1979); *United States v. Davis,* 459 F.2d 167, 170 (6th Cir.1972). Lukens had been in state custody until August 21, 1989, the date a federal complaint was filed. Since there is no suggestion here of an improper state-federal working arrangement, Lukens could not have been brought before a magistrate much sooner. As in *Watson,* 591 F.2d at 1062, by the time federal authorities assumed control over Lukens, his statements were already history.[1]

---

1. Even assuming arguendo that the delay was unnecessary, suppression of the statements would nonetheless be inappropriate in view of his valid *Miranda* waiver, as explained below. *Cf. United States v. Barlow,* 693 F.2d 954, 959 (6th Cir.1982) (a valid *Miranda* waiver also waives the protection of Rule 5(a)), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Indian Boy X,* 565 F.2d 585, 591 (9th Cir.1977) (waiver of *Miranda* rights constitutes a waiver of the rights enunciated in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v.* *United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), including the right to be arraigned without unnecessary delay), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978); *Pettyjohn v. United States,* 419 F.2d 651, 656 (D.C.Cir.1969) (valid waiver of *Miranda* rights to silence and to an attorney is a waiver also of the right to be brought before a magistrate "as quickly as possible"), *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970). That is not to say that law enforcement officers, in these instances, can act slothfully in bringing the defendant before a magistrate either.

The second prong of Lukens' argument regarding voluntariness turns upon his invocation of the right to counsel. At the hearing, Lukens did not allude to any sort of misunderstanding, or outright lack of understanding, concerning the rights which were read to him as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Among the teachings of *Miranda* is that once an accused states he wants an attorney, all interrogation must cease. *Id.* at 474, 86 S.Ct. at 1627. This principle has been reaffirmed countless times since *Miranda.* A valid waiver of this right cannot be shown by pointing to subsequent responses to police-initiated interrogation following advisement of rights. *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981). Nor can an accused's subsequent responses be used to cast doubt on the adequacy of his earlier request for counsel. *Smith v. Illinois,* 469 U.S. 91, 98–99, 105 S.Ct. 490; 494, 83 L.Ed.2d 488 (1984) (per curiam).

Involved here is what *Smith* recognized as the "threshold inquiry," namely whether Lukens actually invoked his right to counsel at the times statements were given to Tkach and Hughes. *Id.* at 95, 105 S.Ct. at 492. Entwined within this inquiry is the larger question of the standard which a court should adopt regarding the nature and effectiveness of an accused's request for counsel.

■ There is some disagreement among the circuits which have considered the manner of the request as to the permissible bounds of police action. In the seminal case on this question, *Nash v. Estelle,* 597 F.2d 513 (5th Cir.1979) (en banc), *cert. denied,* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979), the court held that absent an unequivocal request for counsel, questioning officers may make further inquiry to clarify the accused's wishes. *Id.* at 517. Finding such a holding consistent with *Miranda, see* 384 U.S. at 485, 86 S.Ct. at 1633, the Fifth Circuit explained its reasoning:

> While the suspect has an absolute right to terminate station-house interrogation,

he also has the prerogative to then and there answer questions, if that be his choice. Some persons are moved by the desire to unburden themselves to confessing their crimes to police, while others want to make their own assessment of what to say to their custodians. '[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transfer the *Miranda* safeguards into wholly irrational obstacles to legitimate police activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.' *Michigan v. Mosley,* 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). When ... a desire for immediate talk clearly appears from the suspect's words and conduct, but he also states he wants a lawyer (i.e., "I would like to have a lawyer, but I would rather talk to you"), it is sound and fully constitutional police practice to clarify the course the suspect elects to choose....

*Nash,* 597 F.2d at 517. A majority of the circuits which have addressed the issue adhere to this view and, while requiring that all questioning cease in the face of a request for counsel, permit police officers to pursue a narrow line of questioning aimed at clarifying a suspect's intention regarding his request in those instances where the request is ambiguous or equivocal. *See, e.g., Howard v. Pung,* 862 F.2d 1348, 1351 (8th Cir.1988) (acknowledging, however, that an ambiguous or equivocal request might in some instances be sufficient to require that all questioning cease), *cert. denied,* —— U.S. ——, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989); *Smith v. Endell,* 860 F.2d 1528, 1529 (9th Cir.1988); *Owen v. State of Alabama,* 849 F.2d 536, 539 (11th Cir.1988); *United States v. Gotay,* 844 F.2d 971, 975 (2nd Cir.1988); *United States v. Porter,* 776 F.2d 370 (1st Cir.1985), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); *United States v. Riggs,* 537 F.2d 1219, 1222 (4th Cir.1976). The Sixth Circuit is in the minority with a per se rule which prohibits any questioning once a request for counsel is made, regard-

less of its form. *Maglio v. Jago*, 580 F.2d 202, 205 (6th Cir.1978). The Seventh Circuit has held that the request need not be clear and unequivocal to be proper. *United States ex rel. Riley v. Franzen*, 653 F.2d 1153, 1159 (7th Cir.1981), *cert. denied*, 454 U.S. 1067, 102 S.Ct. 617, 70 L.Ed.2d 602 (1981). The Tenth Circuit has not had an opportunity to address this issue.[2]

Having reviewed the available authorities, including the observation in *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885, that reinterrogation of an accused in custody is a violation of *Miranda* when the right to counsel has been "clearly asserted," the Court adopts the majority position as most consistent with *Miranda*. Thus, when confronted with Lukens' statement that "maybe he should talk to a lawyer," law enforcement officers properly questioned him to clarify whether he had indeed expressed a desire to have counsel present. Lukens' willingness to talk following Hughes questioning was susceptible of two interpretations. Either he had wanted an attorney present but was now waiving that right or he had never requested counsel.

The issue of waiver is a consideration totally separate from the issue of whether the right to counsel has actually been invoked. Relying upon the standard first enunciated in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *Miranda* held that a waiver was valid if made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 475, 86 S.Ct. at 1612, 1628. In deciding whether a valid waiver has been made, courts should consider all circumstances surrounding the questioning, including the defendant's age, experience, education, background, and intelligence. *Fare v. Mi-chael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979), *reh'g denied*, 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979). In the Sixth Amendment context, this determination includes the inquiry as to whether the defendant was made sufficiently aware of his right to have counsel present and of the possible consequences of a decision to proceed without counsel. *Patterson v. Illinois*, 487 U.S. 285, 285, 108 S.Ct. 2389, 2391, 101 L.Ed.2d 261 (1988). The Government need prove waiver only by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

■ Lukens' only other encounter with the law has been in connection with the Crook County charge which led to his arrest in the first place. This alone, however, is insufficient to render a waiver involuntary or unknowing. *See Wernert v. Arn*, 819 F.2d 613, 616 (6th Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988). At the suppression hearing, this middle-aged adult appeared to be intelligent and able to articulate himself well. Hughes testified that before proceeding with any interrogation he went over Lukens' earlier statement about an attorney, explaining the right again as well as the consequences attendant to its nonassertion. He further advised him of the possible prison term for such an offense should the matter be turned over to federal authorities for prosecution.[3] On the stand, Lukens confirmed this in all respects and added that he understood his rights but decided to talk to Hughes anyway. Once Lukens unequivocally invoked his right to have counsel present, Hughes ceased all questioning. Nothing further was said until the trip to Casper when Lukens initiated

---

**2.** This divergence in approaches was recognized in *United States v. Hill*, 701 F.Supp. 1522, 1524 (D.Kan.1988), but the court avoided addressing it directly by holding that a defendant's question inquiring how long it would take to procure an attorney was not even an equivocal request for an attorney. The court did cite *Nash* for the premise that every utterance of the word "attorney" carries no talismanic quality such that its mere mention would invoke the *Edwards* rule. *Id.*

**3.** Advisement by an interrogating officer of the possible penalties a suspect faces is insufficient to overcome one's free will so long as done in a truthful and noncoercive manner. *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978). There is no suggestion here that Lukens' statements to Hughes were prompted by anything but his own intelligent choice after being informed of his rights and the possible penalty. Indeed, Lukens does not deny that Hughes informed him of the prison term in a courteous manner.

the conversation which ensued. After the hearing it was clear to the Court, as it is now, that Lukens' waiver was indeed voluntary, knowing, and intelligent based upon a consideration of the totality of the circumstances. His own testimony as to his alert state and understanding of what was happening, including the nature of the charge and the extent of his rights, supports this determination. While he testified as to his impression behind the initial request for counsel, the record is clear that when queried for clarification, he affirmatively abandoned the request and expressed a desire to talk to authorities. To now put a different gloss upon what transpired would render all questioning designed to elicit clarification of a suspect's request for counsel meaningless and lead to a per se application of the Sixth Amendment right. This, *Miranda* and its progeny do not counsel. Since the Court concludes the waiver was valid, no discussion need be had regarding whether Lukens' initial reference to an attorney in fact constituted a request for counsel.

One final word need be said about the trip to Casper. It was on this trip, coming as it did after Lukens' subsequent unambiguous request for counsel a few hours earlier, that Lukens stated words to the effect that, "You all ought to just shoot me. When you're broke, you do stupid things." This was followed by another statement denying he ever used methamphetamine. It was after these statements that Hughes asked a series of questions regarding Lukens' knowledge of certain persons suspected of methamphetamine trafficking in Montana. Lukens indicated he knew none of the persons named.

In *United States v. Johnson*, 812 F.2d 1329 (11th Cir.1986), a defendant charged with armed robbery of a federally insured credit union in which cash and travelers checks were stolen asked for an attorney during questioning and "in the same breath" stated, "I know all about the checks and where they came from." *Id.* at 1330. A FBI agent then asked the defendant whether he would like an explanation of the federal criminal process, to which an affirmative response followed. After the agent talked about appearances before a magistrate, the setting of bond, and the possible appointment of a public defender, the defendant responded, "All this trouble, all for trying to get some money." *Id.*

The Eleventh Circuit found the initial statement about knowledge of the checks admissible because it was made "in the same breath" as the request for counsel. *Id.* However, it reversed the trial court and remanded the case for a new trial because the appeals court found the second statement inadmissible:

No interest would be served by attempting to list matters that may or may not be discussed by law enforcement officers with an accused in custody after the accused has indicated that a lawyer is desired before further interrogation. It best serves all interests, especially law enforcement, to remain close to the 'bright line': interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation.

While a harmless error analysis may 'save the day' in some cases where law enforcement officers are 'merely being helpful,' we discourage such a practice after an accused, in custody, requests the presence of a lawyer....

*Id.* at 1331.

Although the Court perceives no impropriety in what transpired during the approximately two-hour trip, a trip by the accused and a friendly interrogating officer, the potential for a taint is so great that it prompts this caution. Had Lukens limited his statement solely to what he said prior to his denial of drug use and had Hughes then asked the questions he did, presumably to elicit more direct or indirect information relating to this case, Lukens' responses to further questioning would have been inadmissible; for, Lukens' statement about peoples' financially-motivated actions would not be the sort of statement indicative of a revocation of his prior request for counsel. It would simply have been an irrelevant statement. However, Lukens' additional statement, coming on the heels of his prior statement and deny-

ing use of methamphetamine, preceded Hughes' questions and was a voluntary statement which went directly to his case, allowing the agent to pursue further questioning until the defendant cuts it off by reasserting his *Miranda* protections. Since Lukens denied knowing any of the individuals named, no further questioning ensued.

In sum, Lukens' initial encounter did not trigger Fourth Amendment scrutiny as explained in *Royer*. What transpired between then and the arrest came about as a result of a reasonable suspicion, not unfounded under the circumstances, that criminal activity was afoot. The arrest was based on an outstanding charge from another county, after which time Lukens gave the officer consent to search his car. While the officer could have obtained a warrant, he was not required to given the consensual nature of the search. Any statements Lukens made at the stationhouse were obtained in conformity with his Sixth Amendment right to have counsel present, a right he voluntarily, knowingly, and intelligently waived. His subsequent request for counsel was unequivocal and resulted in the complete suspension of all questioning. The status quo remained until later in the day when Lukens, without prompting, either directly or subtly, initiated a conversation regarding the trouble he was in. The same holds true for the colloquy that occurred during the trip to Casper. No evidence has been presented which would merit suppression.

NOW, THEREFORE, IT IS

ORDERED that defendant's motions to suppress physical evidence, statements, and/or confessions be, and the same are, hereby denied.